IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CRYSTAL AUTUMN BELL, | ) | Case No. 3:18-cv-1621 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

**I.    Introduction**

Plaintiff Crystal Autumn Bell seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for supplemental security income ("SSI") under Title XIV of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards in evaluating Bell's subjective symptom complaints, I recommend that the Commissioner's final decision denying Bell's application for SSI be VACATED and that Bell's case be REMANDED for further consideration.

**II.    Procedural History**

On January 15, 2014, Bell protectively applied for SSI.  (Tr. 20, 228-44).[1]  Bell alleged that she became disabled on December 3, 2013, due to reflex sympathetic dystrophy syndrome

---

[1] The administrative transcript is in ECF Doc. 11.

("RSDS")[2] in her left leg, anxiety, chronic back pain, mental problems, depression, and thyroid issues.  (Tr. 120, 230).  The Social Security Administration denied Bell's application initially and upon reconsideration.  (Tr. 120-54).  Bell requested an administrative hearing.  (Tr. 172).  ALJ Terry Banks heard Bell's case on July 12, 2017, and denied the claim in an October 31, 2017, decision.  (Tr. 17-89).  On May 14, 2018, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-7).  On July 13, 2018, Bell filed a complaint to seek judicial review of the Commissioner's decision.  ECF Doc. 1.

### III.    Evidence

#### A.    Personal, Educational and Vocational Evidence

Bell was born on November 19, 1979, and she was 34 years old on the alleged onset date. (Tr. 238).  Bell had a tenth-grade education, and she did not have any vocational training or relevant transferrable skills.  (Tr. 31, 58).  Bell had previous work as a shipping and receiving clerk, but she was unable to perform any of her past work.  (Tr. 30-31, 86).

#### B.    Relevant Medical Evidence

On October 13, 2011, Bell saw James Weiss, MD, for a medication refill.  Dr. Weiss noted that that she had chronic pain, intermittent swelling, and purple discoloration in her left foot after she dropped a wood pallet on her left leg a month before her visit.  (Tr. 388).  She reported that her treatment had improved her pain and functional status and that she did not have any adverse side effects from Vicodin.  (Tr. 388).

On October 19, 2011, Bell told Corey Russell, DPM, that she had continued pain in her left foot after she dropped a wood pallet on her left leg and Achilles tendon.  (Tr. 381).  She noted that she was using gabapentin for her pain and that she was receiving pain management for

---

[2] RSDS and chronic regional pain syndrome ("CRPS") are "synonymous [terms] used to describe a unique clinical syndrome that may develop following trauma.  SSR 03-2p, 2003 SSR LEXIS 2 *1 (Jan. 1, 2003).  For ease of analysis, I will use "RSDS" whenever the record refers to "RSDS" or "CRPS."

RSDS.  (Tr. 381).  Dr. Russell recommended that Bell perform range of motion exercises and receive physical therapy two to three times per week.  (Tr. 381).  He also gave Bell a walker and recommended that she follow up with pain management.  (Tr. 381).

On January 9, 2012, Bell told William James, MD, that she had chronic pain in her left foot, with intermittent swelling and purple discoloration.  (Tr. 378).  She said that, although she had some trouble with other medications, Vicodin effectively controlled her pain without side effects.  (Tr. 378).  Dr. James continued Bell's treatment through medication but also referred her to be evaluated for spinal cord stimulator ("SCS") therapy.  (Tr. 379).

On October 22, 2013, Bell saw James Otting, MD, at the Comprehensive Center for Pain Management ("CCPM") for treatment of lumbar pain and numbness in her leg.  (Tr. 561). Dr. Otting noted that Bell had stimulation in all areas of pain after an SCS revision, but she had new pain in her left buttock after falling and burning pain in her SCS generator site.  (Tr. 561). Bell complained that she had pain in her left calf and foot.  (Tr. 561).  Bell also stated that an injection on January 6, 2012 improved her functioning, that her SCS reduced her pain by 50%, and that Vicodin was effective in controlling her pain without side effects.  (Tr. 562).  Bell continued seeing Dr. Otting for regular pain management sessions from October 2013 through March 2017.  (Tr. 374, 402, 503-05, 509-11, 514-16, 537-58, 695-96, 705-07, 710-11, 728-30, 759-60, 768-70, 938-95, 1000-01).  At her pain management sessions, Bell regularly rated her lumbar pain between 8 and 7 on a 10-point scale, indicated that her SCS and opioid medications helped her pain without side effects, and said that she was more active and could perform home exercises.  (Tr. 374, 402, 503-05, 509-11, 514-16, 537-58, 695-96, 705-07, 710-11, 728-30, 759-60, 768-70, 938-95, 1000-01).  Bell regularly reported joint and muscle pain, especially in her left calf and ankles.  (Tr. 516, 544, 550, 554, 707, 711, 962, 970, 976-77).  On December 13, 2013, Dr. Otting performed an SCS revision, and on January 14, 2014, he said that Bell's "SCS

reprogramming . . . was able to greatly improve symptoms." (Tr. 374, 402, 556). Bell reported that she had numbness, weakness, and tingling in her leg, but no swelling on March 17, 2015, July 14, 2016, September 13, 2016, and November 15, 2016; however, she reported leg/ankle swelling, discoloration, and coldness on May 12, 2015, July 14, 2015, January 11, 2016, March 8, 2016, and May 10, 2016. (Tr. 505, 511, 696, 730, 995, 983, 989). Over the course of Bell's treatment, Dr. Otting gave her several lumbar sympathetic block injections, which Bell tolerated well and said reduced her pain by up to 75%. (Tr. 538, 544, 550, 564, 566, 568, 570, 572, 574, 696, 706, 965-66, 976-78, 980-81, 994, 1000-01). Diagnostic imaging on September 17, 2015, and November 13, 2015, showed only mild degenerative changes in Bell's spine and that her spinal condition was otherwise normal. (Tr. 759-60, 768, 770). In January through March 2017 – after Bell injured her ankle – Dr. Otting noted that Bell had swollen ankles, joint and muscle pain, numbness, and tingling. (Tr. 941, 948, 955). Nevertheless, she was able to move all her extremities well and could walk with an immobilizing boot on her right leg. (Tr. 942, 948, 956).

On April 11, 2014, Bell told Raja Hanif, MD, that she "fe[lt] well with no complaints" and that her medication was effective. (Tr. 361, 397). On examination, Dr. Hanif noted that Bell had no swelling, no tenderness, and no deformities. (Tr. 398).

On October 13, 2014, Bell went to the triage unit at Bay Park Hospital for treatment of a cough. (Tr. 775). Bell said that she had aching pain all over her body, but examination indicated that her neck, back, lower extremities, range of motion, gait, and neurological function were all normal. (Tr. 776-77). Bell returned to Bay Park Hospital with the same complaints (a cough and "intermittent" pain) on September 18, 2015, but examination again revealed that her neck, back, range of motion, gait, and neurological function were normal. (Tr. 762-64).

On October 21, 2014, December 31, 2014, and January 20, 2015, Bell saw Bryant Ittiara, DO, at CCPM for pain management. (Tr. 519-33). Bell told Dr. Ittiara that she had aching back

pain and "burning" or "throbbing" pain in her left calf and foot.  (Tr. 525, 531).  She also said

that she had numbness, tingling, and weakness in her left leg, but did not report any swelling.

(Tr. 521-22, 528, 533). Bell told Dr. Ittiara that her medication and other treatment helped her

pain without side effects, and that she was able to be more active and perform home exercises.

(Tr. 519-20, 525-26, 531).

In September 2015, Bell had three physical therapy sessions at CCPM.  (Tr. 716, 718,

721).  Records from those sessions indicate that Bell tolerated therapy well, understood her home

exercise plan, and was "slowly progressing" toward her treatment goals.  (Tr. 716, 718, 721).  On

October 6, 2015, Bell had a physical therapy session at Bay Park Hospital, where she told Trent

Gardner, PT, that she had "good and bad days" with her pain.  (Tr. 1003).  Gardner noted that

although Bell's pain and range of motion improved during her physical therapy sessions, she

would return the following day with little or no improvement.  (Tr. 1004-05).

On November 16, 2015, Bell saw Jennifer Delaney, CNP, for treatment of her RSDS.

(Tr. 591).  Nurse Delaney noted that Bell had joint pain but did not have any joint redness,

swelling, or muscle atrophy.  (Tr. 592).  Bell saw Nurse Delaney for five medication

management appointments from February 23, 2016, through June 15, 2017.  (Tr. 1122-38).  Bell

regularly reported having back and joint pain, but examination did not indicate any joint swelling

or muscle atrophy.  (Tr. 1122, 1129, 1132-33, 1136-37).  In addition to refilling Bell's

medication, Nurse Delaney instructed Bell to maintain a healthy diet and exercise regularly.  (Tr.

1123, 1127, 1130, 1134, 1138).  On February 9, 2017, Nurse Delaney noted that Bell had injured

her back in December 2016, but it was healing with treatment.  (Tr. 1126).

On October 20, 2016, Bell told Connie Nolina, RN, that she had chronic back pain

following a car accident and that she wanted to make sure her SCS unit was not damaged.  (Tr.

737-38).  During her visit, diagnostic imaging showed no evidence of compression fracture,

malalignment of the spine, or acute bony pathology, but there was reduced disc space in the L5 S1 region.  (Tr. 745).  On examination, Nurse Nolina noted that Bell's lower extremity strength, range of motion, and sensation were normal.  (Tr. 739-40).  Upon discharge, Nurse Nolina noted that Bell ambulated without assistance and drove herself.  (Tr. 740).

On November 2, 2016, Bell saw Dr. Russell for treatment of an ingrown toenail and pain and swelling in her left ankle.  (Tr. 794).  Dr. Russell noted that Bell was in pain management for RSDS.  (Tr. 794).  On examination, Bell had full muscle strength and her muscle mass, muscle tone, and range of motion were within normal limits.  (Tr. 794).  Dr. Russell debrided the ingrown toenail and gave Bell an ankle brace.  (Tr. 794).

On December 16, 2016, Bell told Gregory Georgiadis, MD, that she injured her right ankle after slipping on ice on December 14, 2016.  (Tr. 841, 1019); *see also* (Tr. 855).  Dr. Georgiadis noted that Bell had gone to Bay Park hospital, but they did not properly reduce her ankle fracture and sent her home in a posterior short leg splint.  (Tr. 841, 1019).  Dr. Georgiadis noted that Bell did not complain of any pain in her upper or lower extremities other than her right ankle pain.  (Tr. 841, 1019).  Dr. Georgiadis admitted Bell for ankle surgery.  (Tr. 844, 1023). On December 17, 2016, Dr. Georgiadis noted that Bell did not have any edema or other issues in her left leg.  (Tr. 848).  Dr. Georgiadis estimated that, after surgery on her right ankle, Bell would be non-weight-bearing for up to three months.  (Tr. 849, 1033).  After surgery, Bell was admitted to a rehabilitation facility for physical therapy.  (Tr. 1037).  She was discharged to home care on December 19, 2016.  (Tr. 1046).  At a follow-up on January 3, 2017, Dr. Georgiadis noted that Bell was doing well and did not note any issues with Bell's left leg. (Tr. 1048).  On January 24, 2017, Dr. Georgiadis noted that Bell had mild swelling in her left leg, but her sensation was intact, she was doing well, and she was able to increase her weight-bearing.  (Tr. 1051).  On March 7, 2017, Dr. Georgiadis noted that Bell was partially weight-

bearing, used a walker and boot to ambulate, and could tolerate her ankle pain. (Tr. 1054). Bell's left ankle was "unremarkable." (Tr. 1054). On May 2, 2017, Dr. Georgiadis removed Bell's boot and noted "minimal swelling" in her ankle. (Tr. 1058). He instructed Bell to wean off her boot and crutches and did not recommend use of any other ambulatory aids. (Tr. 1059). He continued Bell's pain medication and recommended outpatient physical therapy; however, Bell stated she was "not interested" in physical therapy. (Tr. 1059).

### C. Relevant Opinion Evidence

#### 1. Treating Physician—Corey Russell, DPM

On April 14, 2017, Dr. Russell completed a "residual functional capacity assessment form" based on his experience treating Bell from June 2010 through November 2016. (Tr. 925-29). Dr. Russell noted that Bell was diagnosed with RSDS, an unstable ankle, and an ingrown toenail. (Tr. 925). He indicated that Bell's condition improved with treatment, and she had no restrictions related to hazard exposure, operating machinery, or driving. (Tr. 926, 928). Dr. Russell indicated that Bell did not need to have her legs elevated when she sat for prolonged periods and that she would not need "periods of recumbency during the work day as a result of [her] impairments." (Tr. 927).

#### 2. Treating Physician—Gregory Georgiadis, MD

On May 7, 2017, Dr. Georgiadis completed a "residual functional capacity assessment form" based on his experience treating Bell. (Tr. 1013-17). Dr. Georgiadis noted that he treated Bell after she sustained a right ankle fracture in December 2016, that x-rays showed that she was stable after his operation, that Bell was "slowly improving from ankle surgery," and that her prognosis was "good." (Tr. 1013-14). Dr. Georgiadis indicated that Bell could sit for up to two hours at a time and up to eight hours during an eight-hour workday; stand for two hours at a time and up to two hours during an eight-hour workday; and walk for one hour at a time and up to one

hour during an eight-hour workday.  (Tr. 1014).  He said that Bell would need a sit/stand option and would "need to elevate her right lower extremity on an as needed basis . . . for pain and swelling."  (Tr. 1014-15).  He estimated that, if needed, Bell would raise her right leg for 20% of the workday.  (Tr. 1015).  Dr. Georgiadis opined that Bell was able to perform full-time, sedentary work.  (Tr. 1014).  She could occasionally lift up to 20 pounds and occasionally carry up to 10 pounds.  (Tr. 1015).  He said that Bell could not use her feet for repetitive movement such as pushing or pulling leg controls, and she could not squat, crawl, or climb.  (Tr. 1016).  Bell could occasionally bend and reach with both legs.  (Tr. 1016).  Bell had mild restrictions to moving machinery, exposures to extreme temperatures, and driving, and she had a moderate restriction to unprotected heights.  (Tr. 1016).

### 3.    Treating Nurse—Jennifer Delaney, CNP

On July 5, 2017, Nurse Delaney completed a "residual functional capacity assessment form" based on her experience treating Bell.  (Tr. 1140-44).  Nurse Delaney indicated that Bell could sit for one hour at a time and up to four hours during an eight-hour day, but she could not stand or walk at all.  (Tr. 1141).  Nurse Delaney indicated that if engaged in sedentary work, Bell would need to keep her legs elevated at waist level or higher for 50% of the day.  (Tr. 1142).  She said that Bell could never use her feet for repetitive movement; never squat, crawl, or climb; occasionally bend; and frequently reach with both legs.  (Tr. 1143).

### 4.    Consultative Examiner—Sushil Sethi, MD

On August 13, 2015, Sushil Sethi, MD, examined Bell on referral from the Division of Disability Determination.  (Tr. 577-83).  Bell told Dr. Sethi that she had back and left leg pain "off and on," but she denied any paralysis, weakness, or loss of control in any part of her body.  (Tr. 577).  On examination, Dr. Sethi noted that Bell did not have any edema, cyanosis, or clubbing in her lower extremities.  (Tr. 578).  Bell did not use any ambulatory aids, and her gait

was normal.  (Tr. 578).  Diagnostic imaging revealed mild osteoarthritis and a slight decrease in intervertebral space, but her spine was otherwise normal.  (Tr. 579).  Based on his examination, Dr. Sethi determined that Bell had chronic back pain and mild osteoarthritis.  (Tr. 579).  He determined that Bell had a normal ability to sit, stand, walk, lift, carry, and handle objects; she could carry 30-50 pounds frequently; and she could carry 60-100 pounds occasionally.  (Tr. 579).  Dr. Sethi attached to his opinion a "manual muscle testing" form indicating that all of Bell's physical functions were normal.  (Tr. 580-83).

### 5.     State Agency Consultants

On September 17, 2015, state agency consultant Ann Prosperi, DO, evaluated Bell's RFC based on a review of the medical record.  (Tr. 129-31, 134).  Dr. Prosperi determined that Bell could occasionally lift up to 20 pounds; frequently lift up to 10 pounds; stand and/or walk for up to 6 hours in an 8-hour workday; sit for up to 6 hours in an 8-hour workday; and push and/or pull without limitation.  (Tr. 129-30).  Bell could frequently climb ramps/stairs, stoop, crouch, and crawl; never climb ladders, ropes, or scaffolds; and balance and kneel without limitation.  (Tr. 130).  Bell did not have any manipulative or environmental limitations.  (Tr. 130-31).  Based on her evaluation of Bell's RFC, Dr. Prosperi opined that Bell could perform light work.  (Tr. 134).  On January 19, 2016, David Knierim, MD, concurred with Dr. Propseri's opinion, but added that Bell needed to avoid all exposure to heavy machinery and unprotected heights.  (Tr. 147-48, 152).

### D.     Relevant Testimonial Evidence

Bell testified at the ALJ hearing.  (Tr. 52-80).  Bell said that she had not driven her car since she broke her leg in December 2016.  (Tr. 53).  Bell said that she had "some weakness," and had difficulty carrying things such as a basket of laundry due to a torn shoulder.  (Tr. 63).  She also said that her multiple leg injuries "made things pretty impossible" for her, and that she

used a wheel chair to get around.  (Tr. 60-61).  Her lack of mobility caused weight gain.  (Tr. 69).  When she went grocery shopping, she used the store scooter to get around; however, she typically let her husband do the shopping because he was quicker.  (Tr. 74).

Bell said that she originally injured her leg in 2010, when her son hit her with a laundry cart.  (Tr. 58).  She had difficulty walking after that injury, and she suffered multiple subsequent injuries to her legs leading to a "permanent injury."  (Tr. 58).  Bell said that Dr. Russell diagnosed her with RSDS around the same time, after he noticed that the "bottom of [her] foot was turning black and dark purple [and] that it was very sensitive to the touch."  (Tr. 58-59). Bell said that she had burning, tingling, and sharp shooting pains, numbness, severe swelling, and discoloration in her left leg and toes since her 2010 injury.  (Tr. 59).  Bell's left leg and foot swelling made her pain unbearable.  (Tr. 64-65).

Bell used opioid pain relievers four times a day to relieve her pain, she used a Fentanyl patch, and she received periodic LSB steroid injections.  (Tr. 63, 67-68).  When her leg swelled, her doctors told her to wrap her leg, take Motrin, and prop her leg above heart level.  (Tr. 65-65). She propped her leg up for about 5 hours each day.  (Tr. 65).  Bell said that physical therapy helped her walk without a boot and crutches after her 2010 injury, but her condition got worse when she broke her right leg in 2016.  (Tr. 60).  Bell wore a back brace up until she had her SCS implanted in 2012, which helped with her leg and back pain.  (Tr. 61, 70).

Bell testified that, at the time of the hearing, she was able to walk on her right ankle.  (Tr. 79).  She said that she had been walking for "almost three weeks."  (Tr. 79).  She said that her doctors gave her a cane to use when walking, but she did not use it because she was "very stubborn and [felt] embarrassed with it."  (Tr. 79).

Mary Edwards, a vocational expert ("VE"), also testified at the hearing.  (Tr. 81-86).  The ALJ asked the VE whether a hypothetical individual with Bell's age, experience, and education could work if she could perform light work, except that:

> [S]he can never climb ladders, ropes or scaffolds.  She can frequently climb ramps and stars, she can frequently stoop, crouch and crawl.  She can never be exposed to hazards such as dangerous moving machinery and unprotected heights. She is limited to low stress jobs defined as having only occasional decision making required and occasional changes in the work setting.  She should be limited to occasional contact with supervisors, occasional and superficial contacts with coworkers, and no contact with members of the public . . . .  There should be no tandem work assignments.

(Tr. 82).  The VE testified that such an individual could work as a sorter, inspector packer, or assembler.  (Tr. 82-83).  The ALJ asked if the individual in the first hypothetical could work if she were additionally limited to work at the sedentary level and:

> She can only occasionally climb ramps and stairs.  She can occasionally balance, stoop, kneel, crouch, and crawl.  She can occasionally use her bilateral lower extremities for operation of foot controls.  She can occasionally use her bilateral upper extremities for pushing and pulling.

(Tr. 83).  The VE said that such an individual could work as an inspector, assembler, or surveillance system monitor.  (Tr. 83).  The VE said that employers would allow two 15-minute breaks and a 30-minute break in an 8-hour period and that they would allow one unexcused absence per month after the probationary period.  (Tr. 84).  The VE said that either 15% off-task behavior or legs propped at hip level would preclude work.  (Tr. 84).  The VE said that if a sit/stand option were required, the individual in the first hypothetical could work as a sorter, inspector, packer, or assembler; however, the availability of jobs would be significantly reduced. (Tr. 85-86).

## IV.    The ALJ's Decision

The ALJ's October 31, 2017, decision found that Bell was not disabled and denied her application for SSI.  (Tr. 20-32).  The ALJ found that Bell had the severe impairments of: RSDS

in her left leg, osteoarthritis, history of Achilles tendon partial rupture, chronic pain syndrome,

status post back stimulator implant surgery, anxiety disorder, and affective disorders.  (Tr. 22).

The ALJ noted that Bell fractured her right ankle in December 2016, but that she

> underwent surgical repair and she was partially weight bearing on the ankle by
> March 2017 . . . .  In May 2017, [Bell] was instructed to wean off her use of
> crutches and a boot and to use regular tennis shoes.  [Bell] also testified that she is
> now able to bear weight on her ankle and she does not use a cane.  The record
> does not demonstrate that [Bell's] ankle fracture is expected to meet the 12-month
> duration requirement to qualify as a severe impairment.

(Tr. 22-23).  The ALJ also determined that Bell had no impairment or combination of

impairments that met or medically equaled the severity of any of the listed impairments in 20

C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 23-24).  The ALJ found that Bell had the RFC to

perform sedentary work, except that:

> [S]he can never climb ladders, ropes, or scaffolds; occasionally climb ramps and
> stairs; occasionally balance, stoop, kneel, crouch, and crawl; occasionally use her
> bilateral lower extremities for operation of foot controls; and occasionally use her
> bilateral upper extremities for pushing and pulling.  The claimant should avoid
> hazards such as dangerous moving machinery and unprotected heights.  She is
> limited to low stress jobs defined as having only occasional decision-making
> required and occasional changes in the work setting.  The claimant is limited to
> only occasional contact with supervisors, only occasional and superficial contact
> with coworkers, and no public contact.  She should be required to perform no
> tandem work assignments.

(Tr. 25).

In assessing Bell's RFC, the ALJ explicitly stated that he "considered all symptoms" in

light of the medical and other evidence in the record.  (Tr. 25).  The ALJ noted that Bell

complained that she had chronic pain, difficulty standing and walking for extended periods,

periodic swelling in her left leg, and burning, tingling, and numbness in her leg.  (Tr. 25-26).

The ALJ noted that Bell said she had a spinal cord stimulator implanted to help with her leg

issues, controlled her swelling by propping her leg up and taking Motrin, and used an assistive

device when she needed to walk long distances.  (Tr. 26).  The ALJ determined that, although

Bell's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the alleged intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the other evidence in the record.  (Tr. 26-28).  Specifically, the ALJ noted that: (1) medical records from April 2013 through November 2016 indicated that Bell's back, lower extremities, range of motion, gait, reflexes, and sensation were normal; (2) her pain and swelling improved with treatment; and (3) she made good progress during physical therapy. (Tr. 26-28).

In evaluating the medical opinion evidence, the ALJ stated that Dr. Georgiadis' opinion was only due "partial weight" because: (1) the record supported his finding that Bell was able to perform sedentary work (an opinion to which the ALJ accorded controlling weight); and (2) his findings of "additional limitations . . . [were] related to [her] recent ankle fracture, which [was] not expected to last 12 months."  (Tr. 29).  The ALJ also stated that he gave Dr. Russell's opinion – that Bell did not need to elevate her feet – controlling weight because: (1) Dr. Russell had treated Bell for over six years; and (2) his opinion regarding Bell's need to elevate her feet was within his area of expertise and was supported by the record as a whole.  (Tr. 29).  The ALJ also noted that Dr. Sethi's opinion – that Bell retained the ability to sit, stand, and walk for up to 8 hours – was due "partial weight" because the record supported greater functional limitations. (Tr. 29).

Because the ALJ found that Bell had nonexertional limitations that reduced her ability to perform the full range of work at the sedentary level, he relied on the VE's testimony to determine whether Bell could work.  (Tr. 31-32).  Based on the VE's testimony, the ALJ found that Bell could work as an inspector, assembler, or surveillance system monitor.  (Tr. 32).  In light of his findings, the ALJ determined that Bell was not disabled from January 15, 2014 – the

date she filed her application for SSI – through the date of his decision and denied Bell's

application for SSI.  (Tr. 32).

## V.     Law & Analysis

### A.     Standard of Review

The court reviews the Commissioner's final decision to determine whether it was

supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C.

§§ 405(g), 1383(c)(3); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003).

Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person

would accept as adequate to support a conclusion.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234,

241 (6th Cir. 2007).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-

weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  If

supported by substantial evidence and reasonably drawn from the record, the Commissioner's

factual findings are conclusive – even if this court might reach a different conclusion or if the

evidence could have supported a different conclusion.  42 U.S.C. §§ 405(g), 1383(c)(3); *see also*

*Elam*, 348 F.3d at 125 ("The decision must be affirmed if . . . supported by substantial evidence,

even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not

necessary that this court agree with the Commissioner's finding, as long as it is substantially

supported in the record.").  This is so because the Commissioner enjoys a "zone of choice"

within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800

F.2d 535, 545 (6th Cir. 1986).

Even if supported by substantial evidence, however, the court will not uphold the

Commissioner's decision when the Commissioner failed to apply proper legal standards, unless

the error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A]

decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting Sarchet v. Charter, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy.  20 C.F.R. § 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence

15

at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a), 416.912(a).

**B.**     **Severe Impairment**[3]

Bell argues that the ALJ improperly determined that her ankle fracture was not a "severe impairment" based on his conclusion that her impairment did not last for 12 months.  ECF Doc. 13 at 16-17.  Bell asserts that the ambulation impairment resulting from her ankle injury lasted more than 12 months, because she went from ambulating with crutches for 5 months (or 6 months)[4] to requiring a wheelchair or walker – a total assisted-ambulation period exceeding 12 months.[5]  ECF Doc. 13 at 16-17.  She contends that her ankle condition required "pain management [for] almost a year and a half."  ECF Doc. 13 at 17; s*ee also* ECF Doc. 17 at 4-5.

The Commissioner responds that the ALJ adequately complied with the regulations – including SSR 03-2p – in evaluating whether Bell's ankle injury was a severe impairment at Step Two.  ECF Doc. 15 at 21.  The Commissioner argues that the ALJ did not err in finding that Bell's ankle injury was not a severe impairment because it was not expected to last for 12 months or more.  ECF Doc. 15 at 22.  The Commissioner contends that the ALJ did not merely rely upon Bell's cessation of crutches in reaching his conclusion but also relied on Bell's

---

[3] Bell's Issue I is poorly organized and difficult to comprehend.  *See* ECF Doc. 13 at 13-22.  The Commissioner translates Bell's argument to raise questions regarding: (1) the ALJ's finding of Bell's residual functional capacity; (2) the ALJ's assessment of Bell's right-ankle fracture; (3) the ALJ's compliance with Social Security Ruling 03-2p.  *See* ECF Doc. 15 at 1, 11-15, 20-25.  I interpret Bell's argument to challenge the ALJ's treatment of: (1) the severity of Bell's ankle fracture at Step Two; (2) Bell's subjective symptom complaints at Step Four; and (3) Dr. Georgiadis' treating physician opinion at Step Four.  I address each of these issues in turn before proceeding to Bell's Issue II, which challenges the ALJ's not-disabled finding at Step Five.

[4] Bell's brief does not clearly indicate whether she used crutches for five or six months.  *Compare* ECF Doc. 13 at 16 ("[P]laintiff used crutches for some 5 months, but then she was relegated to using the wheel chair after that."), *with* ECF Doc. 13 at 17 ("The period from crutches six months to wheel chair and to walker before ambulation without an assistive device was in excess of twelve months.").

[5] At the time the ALJ issued his decision, October 31, 2017, twelve months had not yet passed after Bell fractured her ankle in December 2016.  (Tr. 32, 841, 1019).  By asserting that more than twelve months have passed, this argument appears to reference evidence not available at the hearing.  ECF Doc. 13 at 17.

testimony that she no longer needed an assistive device for ambulation and the lack of any other evidence indicating that she required an assistive device.  ECF Doc. 15 at 23.  Further, the Commissioner asserts that the ALJ found that Bell's RSDS was a severe impairment at Step Two.  ECF Doc. 15 at 21.

At the second step of the sequential analysis, the ALJ considers whether the claimant has a "severe impairment."  20 C.F.R. § 416.920(a)(4)(ii), (c).  An impairment qualifies as a "severe impairment" only if it is "expected to result in death [or has] lasted or is expected to last for a continuous period of at least 12 months."  20 C.F.R. §§ 416.909, 416.920(a)(4)(ii).  The Sixth Circuit has applied a *de minimis* standard to the Step Two inquiry, meaning that the ALJ must find that a claimant's medically determinable impairment is severe, so long as it has more than a minimal effect and would be expected to interfere with the individual's ability to work.  *See Salmi v. Sec'y of Health & Human Servs.*, 744 F.2d 685, 691 (6th Cir. 1985) ("'An impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work.'" (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984))).  If the ALJ determines that the claimant does not have a severe impairment, or combination of impairments, the regulations direct the ALJ to find that the claimant is not disabled.  20 C.F.R. § 416.920(c).

Step Two is a threshold inquiry "intended to 'screen out totally groundless claims.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)).  "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  *Nejat*, 359 F. App'x at 577 (quoting SSR 96-8p, 1996 LEXIS SSR 5 (Jul. 2, 1996)).  So long as the ALJ considers all the claimant's impairments – severe and non-severe – in the remaining steps of the disability

determination, any error at Step Two is harmless. *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

The ALJ applied proper legal standards and reached a decision supported by substantial evidence in determining that Bell's ankle fracture was not a severe impairment. The ALJ complied with the regulations when he evaluated whether Bell's ankle fracture would at least minimally affect her ability to perform work activities for 12 months or more. 20 C.F.R. §§ 416.909, 416.920(a)(4)(ii); *Salmi*, 744 F.2d at 691; *Brady*, 724 F.2d at 920. Evidence in the record supports the ALJ's conclusion that Bell's ankle fracture was not severe, including: (1) Dr. Georgiadis' notes estimating that Bell would recover within three months after her December 2016 surgery, that she was partially weight-bearing by March 2017, and that she was able to remove her boot and wean off crutches by May 2017; (2) Bell's refusal of physical therapy for her ankle; and (3) Bell's hearing testimony that she could walk without a cane. (Tr. 79, 849, 1033, 1048, 1051, 1054, 1059). Thus, the ALJ's finding that Bell's ankle fracture did not cause a severe impairment fell within the Commissioner's "zone of choice," and this court may not disturb that finding. *Jones*, 336 F.3d at 476; *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241; *Mullen*, 800 F.2d at 545; 42 U.S.C. §§ 405(g), 1383(c)(3). Moreover, even if the ALJ erred in determining that Bell's ankle facture was not a severe impairment, that error was harmless because the ALJ: (1) found that Bell had other severe impairments; and (2) considered all of her symptoms – including her ankle condition and any other non-severe impairments – in analyzing the remaining steps in the sequential analysis. *Nejat*, 359 F. App'x at 574, 576-77; *Farris*, 773 F.2d at 89; *Maziarz*, 837 F.2d at 244; (Tr. 23-32).

Accordingly, I recommend that the Court affirm the ALJ's finding that Bell's ankle fracture was not a severe impairment.

###### C.        Subjective Symptom Complaints

Bell argues that the ALJ "improper[ly] review[ed] evidence pertaining to . . . the pain that reasonably flows from [her RSDS] impacting standing, walking, and sitting as well as continued lower extremity swelling requiring elevation of legs above- heart -level." ECF Doc. 13 at 13. She asserts that SSR 03-2p explains RSDS can result in persistent pain and swelling that might impair mobility in the affected region, its progress does not necessarily correlate with a specific timeframe, and its "transitory nature" and "complex diagnostic process" often results in conflicting medical record evidence. ECF Doc. 13 at 13-15.  Bell contends that she "complained of intermittent swelling" with discoloration and coldness, and that her complaints were consistent with her diagnoses. ECF Doc. 13 at 17; *see also* ECF Doc. 17 at 6.  She argues that the ALJ's failure to consider her "constellation of symptoms" as required by SSR 03-2p resulted in an unsupported ultimate RFC finding. ECF Doc. 13 at 13-22; *see also* ECF Doc. 17 at 6-7.

The Commissioner responds that the ALJ complied with all the regulations – including SSR 03-2p – and that Bell's complaints that she experienced enough swelling to support her need to elevate her legs was inconsistent with other evidence in the record. ECF Doc. 15 at 19-20.  The Commissioner asserts that the ALJ based his assessment on all the relevant medical and other evidence in the case record, including treatment notes, diagnostic imaging, medical opinions, and Bell's own statements regarding her daily activities. ECF Doc. 15 at 11-15.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989).  Nevertheless, an ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about her symptoms when it is inconsistent with objective medical and other evidence. *See Jones*, 336 F.3d at 475–76; SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017) ("We will

consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence.").  In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate her symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and restrictions.  SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. § 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

      If an ALJ discounts or rejects a claimant's subjective complaints, he must state clearly his reasons for doing so.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).  Nevertheless, an ALJ's decision need not explicitly discuss each of the factors.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)).  While the ALJ must discuss significant evidence supporting his decision and explain his conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which he relied into a single tidy paragraph.  *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (6th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense").

      When the claimant alleges that she is disabled due to pain, she must: (1) point to evidence that an underlying medical condition caused the pain; and show that (2) either (a) objective medical evidence confirms the alleged severity of the pain, or (b) the objectively determined

medical condition is so severe that it would be reasonably expected to cause the alleged pain.

*Blankenship*, 874 F.2d at 1123 (citing *McCormick v. Sec'y of Health & Hum. Servs.*, 861 F.2d 998, 1003 (6th Cir. 1988), and *Duncan v. Sec'y of Health & Hum. Servs.*, 801 F.2d 847 (6th Cir. 1986)).  When RSDS is the underlying condition, however, this test is nearly impossible to meet because the very nature of RSDS is that a claimant's reported pain is "out of proportion to the severity of the injury sustained by the individual."  SSR 03-2p, 2003 SSR LEXIS 2 (Jan. 1, 2003); *see also Mills v. Comm'r of Soc. Sec.*, No. 1:16-cv-1190, 2017 U.S. Dist. LEXIS 149197 *11 (N.D. Ohio July 27, 2017) ("[A]s one reviewing federal court has stated, 'the lack of supporting diagnostic and clinical findings is to be expected [in cases of RSDS] and [the lack of such findings] may not provide a sound basis for rejecting a claimant's complaints of severe pain.'" (quoting *Cooley v. Colvin*, No. 12-cv-1284, 2013 U.S. Dist. LEXIS 200435 (N.D.N.Y. Oct. 5, 2013), *adopted* 2013 U.S. Dist. LEXIS 200434 (N.D.N.Y. Nov. 4, 2013))).  Moreover, "conflicting evidence in the medical record is not unusual in cases of RSDS due to the transitory nature of its objective findings and the complicated diagnostic process involved.  SSR 03-2p, 2003 SSR LEXIS 2 *14.  Thus, SSR 03-2p provides that:

> [W]henever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the [ALJ] must make a finding . . . based on a consideration of the entire case record.  This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information providing by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.

SSR 03-2p, 2003 SSR LEXIS 2 *18; *see also Wilson v. Comm'r of Soc. Sec.*, No. 18-2343, 2019 U.S. App. LEXIS 23441 *33 (6th Cir. Aug. 6, 2019) ("The ALJ cannot reject the claimant's statements about the intensity and persistence of the claimant's pain or other symptoms about the effect these symptoms have on the ability to work solely because the available medical evidence does not substantiate the claimant's statements." (quotation marks and alterations omitted)).  The

ALJ should pay close attention to whether "longitudinal treatment records document persistent limiting pain" and include one or more of the following signs "at some point in the time since the date of the precipitating injury":  (1) swelling; (2) autonomic instability (changes in skin color, texture, temperature, and perspiration); (3) abnormal hair or nail growth; (4) osteoporosis; and (5) involuntary movements of the affected region of the initial injury.  SSR 03-2p, 2003 SSR LEXIS 2 * 12.

The ALJ failed to apply proper legal standards in evaluating Bell's subjective complaints of pain in light of her established RSDS diagnosis.  Although the ALJ found at Step Two that Bell's RSDS was a severe impairment, there is no indication at any subsequent step that the ALJ ever explicitly considered the standard in SSR 03-2p.  *See generally* (Tr. 23-32).  To his credit, the ALJ acknowledged that he "must consider other evidence in the record" when objective medical evidence did not support Bell's complaints of pain.  (Tr. 25).  Nevertheless, the ALJ's sole reason for rejecting Bell's complaints about the limiting effects of her RSDS was that "numerous examinations show no significant abnormalities with the claimant's lower extremities."  (Tr. 28).  The ALJ did not acknowledge that objective evidence might conflict with Bell's subjective complaints due to the transitory nature of RSDS.  *See* (Tr. 28).  The ALJ also failed to explain whether evidence other than the objective medical evidence may have supported Bell's statements regarding the intensity, persistence, and limiting effects of her RSDS pain.  *See* (Tr. 28).  Instead, the ALJ did precisely what SSR 03-2p directed him not to do, and he neglected to do what he acknowledged he "must" do.  SSR 03-2p, 2003 SSR LEXIS 2 *12, 18; (Tr. 25, 28).

It is noteworthy that one of the records and opinions of a treating provider to whom the ALJ gave only limited weight actually appeared to provide evidence supporting Bell's statements regarding the intensity, persistence and limiting effects of her RSDS.  Bell was a patient of

Jennifer Delaney, CNP and John Uche, M.D.  (Tr. 29).  They completed a questionnaire expressing the opinion that Bell would be required to elevate her legs about half the time.  (Tr. 1142).  According to that opinion, Bell's diagnosed conditions were: (1) left ankle fixation; (2) right ankle fixation; and (3) pain management for reflex sympathetic dystrophy of lower limb.  (Tr. 1141).  These providers had a longitudinal relationship with Bell spanning the period February 23, 2016 – June 15, 2017.  *See* Exhibit B22F.  (Tr. 1115-1138).  Bell's office encounters with Nurse Practitioner Delaney revealed consistent reports and diagnoses of RSDS.  And she was being prescribed opioids for pain throughout the period.  The ALJ found Nurse Practitioner Delaney's treatment notes to express less severe conditions than the opinions she and Dr. Uche rendered.  But those notes do provide some support for the severity of Bell's RSDS complaints.  The ALJ never acknowledged or discussed that support, as he was required to do.

On January 24, 2017, Dr. Georgiadis, who had surgically repaired Bell's right ankle, noted that Bell had swelling in her left leg (the side on which she had historically experienced her RSDS symptoms).  (Tr. 1051).  The ALJ did not discuss this implicit support for Bell's RSDS claim.

In light of the ALJ's failure to acknowledge and apply SSR 03-2p in evaluating Bell's subjective complaints, I recommend that the case be REMANDED to the Commissioner for further consideration.  I note that, although I have found that the ALJ failed to apply proper legal standards in evaluating Bell's subjective complaints regarding her RSDS pain's effects on her functional capacity, the Commissioner might, after conducting the correct analysis, still reject Bell's subjective complaints.  I also note that substantial evidence supported the ALJ's conclusion that some of the objective medical evidence conflicted with Bell's subjective symptom complaints, including consistent findings that she had a normal gait, range of motion, and neurological function as well as findings that her symptoms improved with exercise.  (Tr.

519-20, 525-26, 531, 739-40, 762-64, 776-77, 794, 942, 948, 956, 1123, 1127, 1130, 1134, 1138).  Nevertheless, remand is warranted for the correct application of the regulatory standards, particularly because I am unable to conclude that the ALJ's error was harmless.

**D.  Medical Opinion Weight**

Bell argues that the ALJ did not give good reasons for "dismissing" Dr. Georgiadis' opinion that she needed to elevate her legs above her heart for 20% of the workday to control her pain and swelling.  ECF Doc. 13 at 18-22.  She asserts that Dr. Russell's opinion – "that [Bell] did not indicate [her] need to elevate legs" – was not sufficient to reject Dr. Georgiadis because: (1) Dr. Russell was a podiatrist, not a pain or orthopedic specialist; and (2) he had not seen Bell in five months before he issued his opinion.  ECF Doc. 13 at 20; *see also* ECF Doc. 17 at 1-10.[6]

The Commissioner responds that the ALJ "properly considered the medical opinion evidence in determining [Bell's] RFC."  ECF Doc. 15 at 15.  The Commissioner asserts that the ALJ adequately explained that he gave Dr. Russell's opinion controlling weight because he was a treating podiatrist, her ankle and leg issues were within his specialty, and the objective medical evidence, including Dr. Georgiadis' treatment notes, supported his conclusion that Bell did not require a leg-elevation limitation.  ECF Doc. 15 at 16-17.  The Commissioner argues that the ALJ also adequately explained that Dr. Georgiadis' opinion was due partial weight because it was inconsistent with other evidence in the record.  ECF Doc. 15 at 17-18.  Further, the Commissioner asserts that the ALJ could have disregarded as speculative Dr. Georgiadis' opinion regarding Bell's need to elevate her leg.  ECF Doc. 15 at 18.  Finally, the Commissioner contends that substantial evidence supported the ALJ's decision to give only partial weight to Dr. Georgiadis' opinion.  ECF Doc. 15 at 17-20.

---

[6] Bell could have, but did not, argue that the opinions of Nurse Practitioner Delaney and Dr. Uche also supported the leg-elevation opinion of Dr. Georgiadis.

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives.  20 C.F.R. § 416.927(c).  An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  "Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'"  *Id.*  (quoting 20 C.F.R. § 404.1527(c)(2)).  Good reasons for rejecting a treating physician's opinion may include that: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (quotation omitted); 20 C.F.R. § 416.927(c).  Inconsistency with nontreating or nonexamining physicians' opinions alone is not a good reason for rejecting a treating physician's opinion.  *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

If an ALJ does not give a treating physician's opinion controlling weight, he must determine the weight it is due by considering the length of the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist.  *See Gayheart*, 710 F.3d at 376; 20 C.F.R. § 416.927(c)(2)-(6).  Nothing in the regulations requires the ALJ to explain how he considered each of the factors.  *See* 20 C.F.R. § 416.927(c).  Nevertheless, the ALJ must provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight."  *Gayheart*,

710 F.3d at 376; *see also Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ("In addition to
balancing the factors to determine what weight to give a treating source opinion denied
controlling weight, the agency specifically requires the ALJ to give good reasons for the weight
he actually assigned."). When the ALJ fails to adequately explain the weight given to a treating
physician's opinion, or otherwise fails to provide good reasons for rejecting a treating
physician's opinion, remand is appropriate. *Cole*, 661 F.3d at 939.

Although not without creating confusion for the claimant, the ALJ applied proper legal
procedures in weighing Dr. Georgiadis' opinion. The ALJ complied with the regulations by
specifically stating that Dr. Georgiadis' opinion was due only "partial weight." 20 C.F.R.
§ 416.927; (Tr. 29).[7] The ALJ acknowledged that Dr. Georgiadis was a treating physician and
that his opinion – that Bell could perform full-time, sedentary work – was due controlling weight
because it was supported by and consistent with the record as a whole. (Tr. 29). Further, the
ALJ adequately explained why he discounted the other portions of Dr. Georgiadis' opinion,
including Dr. Georgiadis' opinion that Bell would have to elevate her right leg for up to 20% of
the workday, because the "additional limitations . . . appear[ed] to be related to [Bell's] recent
ankle fracture, which is not expected to last 12 months." 20 C.F.R. § 416.927(c); *Gayheart*, 710
F.3d at 376; *Cole*, 661 F.3d at 938-39; (Tr. 29). Substantial evidence also supported the ALJ's

---

[7] It bears mention that the Commissioner normally asserts that the ALJ is not required to give any
deference to opinions from medical sources on issues reserved to the Commissioner, such as whether
someone is capable of working at all or regarding the exertional level at which a person might be able to
function. 20 C.F.R. §§ 404.1527(d), 416.927(d). These issues include: (1) whether a claimant has an
impairment or combination of impairments that meets or medically equal an impairment in the Listing of
Impairments; (2) the claimant's RFC; (3) the application of vocational factors; and (4) whether a claimant
is "disabled" or "unable to work." 20 C.F.R. §§ 404.1527(d)(1)–(2), 416.927(d)(1)–(2). When, as here,
the ALJ accepts and gives controlling weight to just such an opinion, it creates confusion for the claimant,
because it makes it appear the Commissioner gets to pick and choose which of the applicable regulations
SSA may utilize in order to deny a claim. This is particularly problematic when, as here, the ALJ also
discredits other portions of the treating source's opinion. And this confusion is manifested when, as here,
the vocational expert testified that a person who must do what Dr. Georgiadis said Bell must do – elevate
her leg 20% of the day – would not be able to find a sedentary exertional level job, or any other
employment. *See* p. 11, *supra.*

reason for rejecting Dr. Georgiadis' leg elevation limitation because Dr. Georgiadis specifically limited his leg elevation limitation to swelling in the "right lower extremity." 42 U.S.C. § 1383(c)(3); *Elam*, 348 F.3d at 125; (Tr. 29, 1051).  Because Bell's right ankle injury was not expected to last 12 months or more, the ALJ was not required to credit limitations based on that injury.  *See* 42 U.S.C. § 423(d)(1)(A) (To be disabling, a limitation must have "lasted or can be expected to last for a continuous period of not less than 12 months.").

Thus, because substantial evidence supported the ALJ's conclusions that Dr. Georgiadis' opinions regarding Bell's limitations were based only on an injury that was not expected to last 12 months, the ALJ's decision to give only partial weight to Dr. Georgiadis' opinion fell within the Commissioner's "zone of choice."  *Mullen*, 800 F.2d at 545.  Accordingly, I recommend that the court reject Bell's argument that the ALJ's decision to give partial weight to Dr. Georgiadis' opinion was error.[8]

### E.    Disability Finding

Bell asserts that, because the ALJ's hypothetical question to the VE did not include that she was required to raise her legs for 20% of the day and needed a sit/stand option, the VE's testimony was not substantial evidence supporting the ALJ's not-disabled decision.  ECF Doc. 13 at 24-25.  Bell also contends that the VE testimony that a leg-elevating limitation would preclude work further undermines the ALJ's conclusion that she was not disabled.  ECF Doc. 13 at 25; *see also* ECF Doc. 17 at 10.

---

[8] I also note that the ALJ's discussion of Dr. Georgiadis' opinion could have been more developed because, although Dr. Georgiadis expressly limited the leg elevation limitation to Bell's right leg, he did not expressly limit the other limitations in his opinion to Bell's right leg.  *See, e.g.*, (Tr. 1015-16) (providing limitations on lifting, repetitive foot movements, squatting, and exposure to machinery). Nevertheless, Bell has forfeited by failing to raise in her merits brief any argument challenging the ALJ's treatment of the other limitations in Dr. Georgiadis' opinion.  *See Murr v. United States*, 200 F.3d 895, 902 (6th Cir. 2000) ("[T]he Magistrate judge Act . . . does not allow parties to raise at the district court stage new arguments or issues that were not presented to the magistrate [judge]."); *Stankoski v. Astrue*, 532 F. App'x 614, 620 (6th Cir. 2013).

The Commissioner argues that the VE's testimony was substantial evidence supporting the ALJ's not-disabled finding because ALJ's hypothetical question to the VE matched the ALJ's RFC finding.  ECF Doc. 15 at 24.  The Commissioner asserts that the ALJ was not required to include a leg-elevation limitation in his hypothetical question, because he was only required to incorporate into the hypothetical question limitations that he found credible.  ECF Doc. 15 at 25.

At the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence as to whether the claimant can perform a significant number of jobs in the national economy.  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. § 416.920(a)(4)(v).  An ALJ may determine that a claimant has the ability to adjust to other work in the national economy by relying on a vocational expert's testimony that the claimant has the ability to perform specific jobs.  *Howard*, 276 F.3d at 238.  A vocational expert's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC.  *See id.* (stating that "substantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments" (internal quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations").  "An ALJ is only required to incorporate into a hypothetical question those limitations he finds credible."  *Lee*, 529 F. App'x at 715; s*ee also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.").

As a technical matter, the ALJ applied proper legal standards and reached a decision supported by substantial evidence. Here, the ALJ was not required to find that Bell was disabled based on the leg elevation limitation or other limitations stemming from her RSDS because the ALJ did not find those limitations credible and did not incorporate them into his RFC finding. *Howard*, 276 F.3d at 238; *Lee*, 529 F. App'x at 716; *Blacha*, 927 F.2d at 231; (Tr. 25-30). Further, because the ALJ's hypothetical questions to the VE accurately represented the ALJ's RFC finding, the VE's testimony – that Bell could work as an inspector, assembler, or surveillance system monitor – was substantial evidence supporting the ALJ's finding that Bell was not disabled. *Howard*, 276 F.3d at 238; 20 C.F.R. § 416.920(a)(4)(v); (Tr. 25, 82-83). In light of these findings, I would normally recommend tat the Court affirm the ALJ's Step Five analysis. Nevertheless, the ALJ might conclude, upon remand, that additional limitations must be incorporated in Bell's RFC upon proper consideration of her subjective symptom complaints. In the event that additional limitations are incorporated into Bell's RFC, additional VE testimony may be necessary upon remand.

## VI. Recommendation

Because the ALJ failed to apply proper legal standards in evaluating Bell's subjective symptom complaints, I recommend that the Commissioner's final decision denying Bell's application for SSI be VACATED and that Bell's case be REMANDED for further consideration.

Dated: September 24, 2019

Thomas M. Parker
United States Magistrate Judge

_____

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).